2008 UT App 220

**STATE of Utah, in the interest of J.O. and N.W., persons under eighteen years of age.**

**S.O., Appellant,**

v.

**State of Utah, Appellee.**

No. 20070609–CA.

Court of Appeals of Utah.

June 5, 2008.

Dee W. Smith, Ogden, for Appellant.

Mark L. Shurtleff, atty. gen., and John M. Peterson, asst. atty. gen., Salt Lake City, for Appellee.

Martha Pierce, Salt Lake City, Guardian Ad Litem.

Before GREENWOOD, P.J., THORNE, Associate P.J., and McHUGH, J.

### OPINION

THORNE, Associate Presiding Judge:

¶ 1 S.O. (Mother) appeals from the juvenile court's termination of her parental rights in J.O. and N.W. (the Children). We affirm.

### BACKGROUND

¶ 2 J.O. was born on November 19, 2000, and N.W. was born on October 19, 2004.

J.O.'s father is deceased, and N.W.'s father is not a party to this action.

¶ 3 The State first became involved in the Children's lives in May 2005, when Division of Child and Family Services (DCFS) caseworkers visited Mother's home and found it to be far below minimum standards for cleanliness and safety. Specifically, the home had eight cats, there was fecal matter on the walls near the full litterboxes, and the house had an overwhelming odor of cat urine and feces. By the time of a follow-up visit two weeks later, the home had been cleaned and met DCFS standards. However, DCFS made a third visit in June 2005 and again determined that the home fell below minimum standards. On July 13, 2005, the State filed a petition for protective supervision alleging environmental neglect. At the pretrial hearing on July 20, 2005, Mother admitted to the facts alleged in an amended petition and was ordered to successfully complete a parenting class and to maintain the home to DFCS standards. The Children remained in Mother's custody, and review hearings were held in January and April 2006.

¶ 4 On June 1, 2006, the juvenile court issued a warrant placing the Children in protective custody due to evidence that Mother's boyfriend, John Willoughby, had physically abused N.W. Prior to removing the Children from the home, DCFS confronted Mother about Willoughby's abuse. Mother initially denied the abuse, but after Willoughby admitted to the allegations Mother conceded that the abuse had occurred. Despite this, Mother would not commit to keeping Willoughby away from the Children.

¶ 5 Based on this incident, the State filed a new petition seeking custody of the Children on June 6, 2006. An adjudication was held on June 21, at which Mother admitted to the factual allegations of the new petition and the Children were found to be abused. Mother was ordered to complete the previously-ordered parenting class, undergo a mental health evaluation and drug testing, keep a clean house, and have no further contact with Willoughby. Mother substantially complied with these orders. The Children remained in DCFS custody during this time period.

¶ 6 After the adjudication, Mother resided with her father until March 2007, when she moved in with Braden Sanchez. When Sanchez was evicted, Mother moved in with Jared Weston. Mother had been living with Weston for approximately two months when the termination trial commenced in June 2007.

¶ 7 At the conclusion of the termination trial in July 2007, the juvenile court terminated Mother's parental rights in the Children. The juvenile court made numerous findings of fact in support of its termination order, including a reiteration of the environmental neglect issues from 2005; findings related to domestic violence occurring between Mother and N.W.'s father; findings detailing Willoughby's abuse of N.W. and Mother's response thereto; and findings related to allegations of prior sexual abuse, lewdness, and domestic violence committed by Willoughby. The juvenile court also made findings relating to Mother's parenting, concluding generally that Mother was unable to internalize and apply the parenting skills that she had been taught in her court-ordered parenting class. The court found that Mother was currently unemployed and that she had failed to document completion of a court-ordered mental health assessment. The court also made findings regarding the Children's mental health issues and delayed development. In evaluating the Children's best interests, the court found that the Children "are in need of a stable home environment where the [C]hildren are loved and protected. [Mother], however, is either unable or unwilling to provide this stability."

¶ 8 In light of these factual findings, the juvenile court concluded that Mother was an unfit parent and that termination of parental rights was in the Children's best interests. Accordingly, the court terminated Mother's parental rights. Mother now appeals the court's termination order.

## ISSUE AND STANDARD OF REVIEW

¶ 9 Mother challenges the sufficiency of the evidence in support of the juvenile court's determinations that she is an unfit parent and that termination of her rights is in the

Children's best interests. "Whether a parent's rights should be terminated presents a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. "Because of the factually intense nature of such an inquiry, the juvenile court's decision should be afforded a high degree of deference." *Id.* Accordingly, we will not disturb the juvenile court's decision unless it is " 'against the clear weight of the evidence' " or leaves us with " 'a firm and definite conviction that a mistake has been made.' " *Id.* (quoting *In re Z.D.*, 2006 UT 54, ¶ 40, 147 P.3d 401).

## ANALYSIS

¶ 10 Mother argues on appeal that the evidence before the juvenile court was insufficient to support its findings that Mother is an unfit parent and that termination of her parental rights is in the Children's best interests. We agree with Mother that certain factual findings entered by the juvenile court are unsupported by the evidence and should not have been considered. However, the remaining findings are supported by the evidence and are sufficient to support the juvenile court's conclusion that Mother's rights should be terminated. Accordingly, we affirm the judgment of the juvenile court.

### I. Findings Must Be Supported by Some Evidence

¶ 11 Mother correctly identifies certain findings entered by the juvenile court that were not supported by evidence or testimony before the court. Specifically, Mother takes issue with the findings contained in paragraph 15 of the juvenile court's termination order:

[Mother] had visits with the children after they were placed in [DCFS] custody. [Mother] did not control [N.W.] when she visited with her and [N.W.] would often scream, would demand attention and would make a mess. [Mother] rarely paid attention to [J.O.] and [J.O.] would often play by herself or seek attention from [Mother]. As the visits progressed, however, [Mother's] parenting did improve at approximately the end of August. On October 03, 2006, the [DCFS] caseworker asked [Mother] to discontinue bringing Pepsi for the children due to the concerns of hyperactivity related to caffeine and sugar. [Mother] said she would not give the children the drink but the foster mother reported she found Pepsi in [N.W.'s] bottle when [N.W.] came home. Throughout all of the visits [Mother] has had with the children, [M]other continued to bring Pepsi to the visits and sneak Pepsi to the children despite the requests not to by the [DCFS] caseworker.

Mother argues, and we agree, that there was no testimony or other evidence to support many of the facts contained in paragraph 15.

¶ 12 For example, as to Mother's visitations with N.W., there was no testimony that Mother failed to control N.W. Rather, the caseworker testified that Mother's initial visits were "really strained" but that this was usual in her experience. The caseworker further testified that the visitations improved and that although N.W. would scream and yell to get attention, "[Mother] really tried to work on that and tried to work on being appropriate in trying to divert [N.W.] because of her age that's really all you can do." The caseworker did testify that she was concerned about Mother's lack of attention to J.O., but attributed this lack of attention in large part to Mother's need to work with N.W.

¶ 13 More troubling is paragraph 15's description of Mother's repeatedly sneaking soft drinks to J.O. after being directed not to by the caseworker due to J.O.'s hyperactivity. The testimony was actually that Mother had originally let the Children drink her soda and did not stop doing so immediately upon the request of the caseworker. Nevertheless, the caseworker testified that Mother did stop giving the Children soft drinks after "a couple of times of telling her not to do it." There was no testimony supporting the juvenile court's finding that the foster mother had found Pepsi in N.W.'s bottle.

¶ 14 Mother points out that paragraph 15 of the termination is taken word for word from paragraph 17 of the State's petition to terminate parental rights. There was the suggestion at oral argument that perhaps once the decision to terminate had been

made, the termination order was prepared solely by reference to the petition without taking into account the actual testimony. While this scenario explains how the unsupported findings ended up in the termination order, the findings remain unsupported and are therefore inappropriate.

¶ 15 We see no harm in the juvenile court relying on the actual language of the State's petition in its findings so long as that language actually reflects both the evidence at trial and the court's reasoned conclusions about that evidence. However, certain portions of paragraph 15 of the termination order do not meet this standard. Accordingly, we hold the findings contained in paragraph 15 to be clearly erroneous to the extent that they conflict with the actual testimony as described herein, and caution the juvenile court to ensure that its findings of fact are actually supported by testimony or other evidence. Mother alleges similar discrepancies in paragraphs 16 and 20 of the termination order, which were also taken verbatim from the State's termination petition.[1] While we also deem those findings clearly erroneous to the extent that they do not track the evidence at trial, we do not examine those findings in detail.

II. Supported Findings Sufficient to Justify Termination

¶ 16 Despite our determination that certain findings by the juvenile court are unsupported by the evidence, the juvenile court made numerous other findings that are adequately supported. *See generally In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 (stating that we will not disturb the juvenile court's decision unless it is against the clear weight of the evidence or leaves us with a firm and definite conviction that a mistake has been made); *In re O.D.*, 2006 UT App 382, ¶ 12, 145 P.3d 1180 (explaining that an appellant must demonstrate that, despite the marshaled evidence, " 'the [juvenile] court's findings are so lacking in support as to be against the clear weight of the evidence' " (alteration in original) (quoting *In re L.N.*, 2004 UT App 120, ¶ 12, 91 P.3d 836)), *cert. denied*, 153 P.3d 185 (Utah 2007). With the few previously noted exceptions, the juvenile court's findings in this case are not against the clear weight of the evidence, and we will not disturb them.

¶ 17 The juvenile court's findings focused on two main themes: the instability in Mother's life and her inability to deal with the Children's special needs. The court found that Mother was unemployed at the time of trial, had failed to maintain a residence of her own for a substantial period of time,[2] had failed to document her claimed completion of a court-ordered mental health evaluation, and had failed to substantially comply with her service plan or remedy the circumstances leading to the Children's removal. The court also found that Mother had been informed about J.O.'s mental health issues, temper tantrums, and aggression, and that N.W. was delayed in speech and some gross motor skills. Despite these special needs, the court found that Mother was unable to internalize and apply the parenting techniques she had been taught in her parenting course.

¶ 18 Ultimately, the juvenile court concluded that Mother was an unfit parent for failing to remedy the circumstances leading to out-of-home placement, *see* Utah Code Ann. § 78–3a–407(1)(d) (Supp.2007), and for failure of parental adjustment, *see id.* § 78–3a–407(1)(e). The juvenile court's factual findings, as summarized above, support these conclusions.

¶ 19 Mother argues that she corrected the circumstances leading to out-of-home placement when she terminated her relationship with Willoughby. However, Mother's focus on Willoughby's presence as the sole cause of the Children's removal is, in our view, unreasonably narrow. The juvenile court properly

---

1. For example, paragraph 16 states that Mother had not completed a mental health assessment when there was some evidence to the contrary; paragraph 20 relies on reports from N.W.'s father, but N.W.'s father did not testify.

2. Although the court did not make express findings about Mother's residential history, the record suggests that Mother tended to seek housing with new acquaintances and that these arrangements did not lend themselves to long-term stability. The juvenile court did find that Mother chose not to participate in a transitional housing program facilitated through DCFS.

looked at the circumstances as a whole and determined that Mother's relationship with Willoughby was both a problem in its own right and a symptom of Mother's unstable lifestyle. Despite Mother's termination of her relationship with Willoughby, the juvenile court concluded that the Children "are in need of a stable home environment where the [C]hildren are loved and protected" and that Mother "is either unable or unwilling to provide this stability." In light of the court's findings regarding Mother's employment, housing, and mental health; the Children's very specific needs and problems; and other factors, we cannot say that the evidence was insufficient to support the juvenile court's unfitness determination.

¶ 20 Mother similarly attacks the juvenile court's determination that termination of her parental rights was in the Children's best interests. Here, Mother emphasizes the service plan's reference to the Children "maintain[ing] a bond" with Mother and its description of Mother as being very bonded to the Children, coupled with her completion of all weekly visitations with the Children, to argue that she and the Children remained bonded at the time of the termination trial. Mother suggests that because the parent-child relationship had not been "effectively destroyed," that the strong presumption that children should remain with their parents has not been overcome. *See In re W.D., III*, 856 P.2d 363, 367 (Utah Ct.App.1993) ("[T]he strong presumption that children should remain with their parents may be overcome if the parents' conduct 'has effectively destroyed the parent-child relationship.'" (quoting *P.H. v. Harrison*, 783 P.2d 565, 569 (Utah Ct.App.1989))).

¶ 21 Even if we were persuaded by Mother's characterization of the bond between herself and the Children, it is not this court's prerogative to substitute our judgment for that of the juvenile court. *See In re B.R.*, 2007 UT 82, ¶¶ 12–15, 171 P.3d 435. As the Utah Supreme Court has recently noted, the continuing existence of some bond between parent and child does not necessarily preclude a finding that termination is in the child's best interests. *See id.* ¶ 15 (affirming juvenile court's termination decision "despite continued love, which will almost always exist when a child has formed a bond with a parent"). In this case, the juvenile court considered the evidence before it and concluded that "[i]t is in the best interest of the [C]hildren to terminate the parental rights of [Mother] in order to put an end to the destructive life cycle of which the [C]hildren have been a part for so long and to give the [C]hildren the security of a permanent home."

¶ 22 The juvenile court's findings, taken as a whole, are sufficient to justify its decision to terminate Mother's parental rights. Mother has not identified sufficient grounds for us to second-guess the juvenile court's conclusion in this matter, and we therefore decline to do so.

## CONCLUSION

¶ 23 We agree with Mother that certain factual findings expressed in the termination order were not supported by trial testimony and should not have been considered in terminating Mother's parental rights. However, the remaining findings adequately support the juvenile court's ruling that there were grounds for termination and that termination was in the Children's best interests. Accordingly, we affirm the juvenile court's termination order.

¶ 24 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge and CAROLYN B. McHUGH, Judge.