2011 UT App 407

**In the interest of S.Y.T., a person under eighteen years of age.**

**D.T. and S.T., Appellants,**

v.

**C.M., Appellee.**

**No. 20100857–CA.**

Court of Appeals of Utah.

Dec. 1, 2011.

---

**31.** 215 U.S. at 10, 30 S.Ct. 3.

Michael Rawson, St. George, for Appellants.

Terry L. Hutchinson, St. George, for Appellee.

Martha Pierce, Salt Lake City, Guardian ad Litem.

Before Judges DAVIS, McHUGH, and ROTH.

## OPINION

DAVIS, Presiding Judge:

¶ 1 D.T. (Father) and S.T. (Mother) (collectively, Parents) appeal an order terminating their parental rights to S.Y.T. (Child) and granting custody to C.M., Child's half-sister (Sister). We affirm.

## BACKGROUND[1]

¶ 2 Child was born in February 2000 and resided in Tennessee with Parents for the majority of her upbringing. Father is the biological parent of both Child and Sister, who are thirteen years apart in age. Father has a history of sexually abusing his children. He sexually abused his stepdaughter (Stepdaughter) for four years, ending when she was seventeen. On one occasion, Father's son (Son) inadvertently walked in on Father while he was abusing Stepdaughter. Father also abused Sister for an entire summer that Sister stayed with him when she was thirteen, just after Child was born.[2] On at least one occasion that summer, Mother, who is Sister's stepmother, facilitated the abuse of Sister by physically restraining her. Sister reported the abuse when she was sixteen and ceased visiting Father after that point.

¶ 3 Several years later, in 2006, Sister traveled to Tennessee from Utah to visit friends and check in on Child, at which time Mother asked Sister to take Child back to Utah for the summer. Sister agreed and cared for Child during that summer and then

returned Child to Parents. In March 2007, Parents contacted Sister to request that she take Child again, this time for possibly a few years while Parents rectified problems with their housing situation. Sister agreed and moved Child into her Utah home in April 2007, where Child remained until January 2008. Upon Child's move to Utah, Sister petitioned the Utah district court for guardianship of Child. Parents consented to the guardianship, and the district court approved the appointment on May 3, 2007. The guardianship was to remain in effect "until ... [C]hild reaches the age of majority or until changed by Order of the Court."

¶ 4 Approximately five months later, on October 18, 2007, Parents petitioned the same Utah court to revoke the guardianship order, explaining that they were rescinding their consent to the guardianship appointment because Sister refused their requests to return Child to them. The district court granted Parents' motion to terminate guardianship on November 8, 2007, and ordered Sister to return Child to Parents. On November 20, 2007, Sister submitted a petition for a protective order, stating that she was "concerned for the safety of ... [C]hild" in light of Father's history of sexual abuse and Mother's conduct in support of that abuse. On December 31, 2007, in the period between the filing and ruling on the first protective order, Sister filed a petition to terminate Parents' parental rights (the Termination Petition). The first protective order petition was transferred from the district court to the juvenile court where it was denied on January 9, 2008, based on the juvenile court's determination that no exigency existed. Consequently, Sister returned Child to Parents in early January 2008 and filed a second protective order petition on January 11, 2008.[3] The second protective order petition

---

1. "We recite the facts in a light most favorable to the juvenile court findings." *In re L.M.*, 2001 UT App 314, ¶ 2, 37 P.3d 1188.

2. Sister was no longer living with Father when she was abused. She spent that summer with him as part of a visitation agreement.

3. Sister did not indicate under which statute she filed either of her protective order petitions. *See generally* Utah Code Ann. § 78A-6-302 (2008)

(describing protective orders under the Juvenile Court Act); *id.* §§ 78B-7-203 to -204 (2008 & Supp.2011) (describing protective orders under the Child Protective Order statute). Resolution of this ambiguity is unnecessary to our analysis because both statutes impose a similar burden of proof. *See id.* § 78B-7-203(5) ("If the court determines, based on a preponderance of the evidence, that the minor is being abused or is in imminent danger of being abused, the court shall

was granted, and Child was returned to Sister around February 2008.

¶ 5 Parents filed a motion to dismiss the Termination Petition and an answer to the Petition, arguing that the Utah courts lacked subject matter jurisdiction under the Utah Uniform Child Custody Jurisdiction and Enforcement Act (UUCCJEA),[4] that Utah was an inconvenient forum, that Parents never physically or sexually abused Sister, and that Sister beat Child on at least one occasion. Parents also alleged that Sister provided them with false contact information and hid Child from Parents with the intent to take Child from them permanently. In support of that assertion, Parents stated that they drove to Utah between May and June 2007 to "try and locate [Sister] and [Child,] but it became apparent that [Sister] was hiding [Child] from [them] and [they] were unable to find them." Parents' motion to dismiss the Termination Petition also stated that they filed a document rescinding Sister's guardianship appointment on June 1, 2007, with a court in Tennessee. Parents claim their recision was faxed to the Utah Fifth District Court and to the police department in St. George, Utah, on June 1, 2007.

¶ 6 In a hearing on Parents' motion to dismiss the Termination Petition, the Utah juvenile court determined that Utah is the home state of Child and that Child has significant connections to Utah, but that Utah is nonetheless an inconvenient forum (the Inconvenient Forum Order). The juvenile court stated, "Tennessee will become the State of original jurisdiction[, and i]n the event the State of Tennessee declines, the judges from both Courts will talk." The juvenile court gave Sister ninety days to file an action in Tennessee and concluded that Utah would maintain "emergency jurisdiction

under Utah Code [section] 78B–13–204" until Tennessee took jurisdiction. The Utah juvenile court judge contacted the Tennessee judge assigned to the case after Sister filed a termination petition in that state. In the telephone conversation between the courts, for which the parties were not present, the Tennessee judge "declined jurisdiction, finding that the primary nex[u]s for the issues was in the State of Utah." The communication was memorialized in a memorandum authored by the Utah court and an order issued by the Tennessee court, both of which were promptly mailed to the parties. *See generally* Utah Code Ann. § 78B–13–110(4) (2008) (requiring the courts to make a record of the communication, to promptly inform the parties of the communication, and to grant the parties access to the record made); *id.* § 78B–13–110(5) (defining "record" in this context to include a memorandum "made by a court after the communication"). The record of the communication indicates that the courts "discussed the general nature of the case and the overall jurisdiction question.... [The Utah court] ... explained that [it] had previously ruled that the case should be heard in Tennessee as the most convenient forum[ ] for the reasons set forth in [its] written ruling on the issue."

¶ 7 The Termination Petition then proceeded in Utah and was heard over the course of a three-day bench trial in 2010. The juvenile court heard testimony from Stepdaughter, Sister, Father, Mother, and Son as to the allegations of sexual abuse. Sister and her husband each testified that they intended to adopt Child if Parents' parental rights were terminated. The juvenile court ultimately found that Parents had

sexually abused [Stepdaughter] and [Sister]. Despite the sincere denials by Fa-

enter a child protective order."); *id.* § 78A–6–302(1) (providing for the same, as well as establishing additional situations in which a child protective order can be granted under the Juvenile Court Act). While Sister also did not indicate which statutory framework authorized her Termination Petition, it likely fell under the Termination of Parental Rights Act, *see id.* §§ 78A–6–501 to –515 (2008). The juvenile court's review of the Termination Petition was authorized, as discussed *infra* ¶ 19, under the Utah Uniform Child Custody Jurisdiction and Enforcement Act's provisions for home state jurisdiction, *see*

*id.* § 78B–13–201(1)–(2) (2008) (explaining that this section provides the "exclusive jurisdictional basis for making a child custody determination by a court of this state"). Although the parties dispute whether the juvenile court had jurisdiction, and under what statutory provisions, to rule on the protective orders, resolution of such is unnecessary to our analysis, *see infra* ¶ 12 n. 5.

4. We cite the most current version of the Utah Code for the convenience of the reader.

ther and Mother, and the other evidence which they submitted, the Court [was] persuaded by the credible testimony of [Sister], [Stepdaughter,] and [Son]. The Court heard testimony by these three witnesses that they either witnessed or experienced sexual abuse by Father and/or Mother and the Court [found] that their testimony carries the day.

The juvenile court then concluded that

[t]he sexual abuse committed by Father and Mother against a sibling constitutes neglect within the definition of the Juvenile Court Act because of the risk of harm to [Child]. Utah Code Ann. § 78A–6–105(25)(a)(iv) [ (Supp. 2011) ]. Neglect is a ground for termination of parental rights. [*Id.*] § 78A–6–507(1)(b) [ (2008) ]. In addition, Father and Mother are unfit parents based on the sexual abuse, also a ground for termination. [*Id.*] § 78A–6–507(1)(c).

The juvenile court then considered what was in the best interest of Child, weighing the foregoing with the fact that Sister and her husband were willing to adopt Child if the Termination Petition was granted. It concluded that Child faced a great enough risk of being sexually abused if left in the care of Parents that it was in Child's best interest that Parents' parental rights be terminated.

¶ 8 Parents then filed a motion pursuant to rule 59 of the Utah Rules of Civil Procedure to amend the findings or for a new trial (the Rule 59 Motion), contending that the sections of the Juvenile Court Act that the juvenile court relied on to terminate their parental rights "do not exist or do not apply," that the juvenile court lacked personal jurisdiction over them, and that the juvenile court's findings were not supported by sufficient evidence. The juvenile court admitted that its citations to the Juvenile Court Act contained errors, and the court provided revised text to clarify the errors in the original order. The court rejected Parents' personal jurisdiction argument, explaining that lack of personal jurisdiction is an affirmative defense that was waived when Parents failed to argue it in their answer or by motion. Lastly, the juvenile court rejected Parents' insufficiency challenge, stating that there was sufficient evidence to support the court's findings.

Parents appeal from the juvenile court's order terminating their parental rights and from its denial of the Rule 59 Motion.

## ISSUES AND STANDARDS OF REVIEW

¶ 9 On appeal, Parents argue that Utah lacked subject matter jurisdiction over Child. Alternatively, Parents argue that the juvenile court erroneously determined that Utah was Child's home state under the UUCCJEA because Child was illegally retained in Utah by Sister. "Both jurisdictional questions and questions of statutory interpretation are questions of law that we review for correctness." *Meyeres v. Meyeres,* 2008 UT App 364, ¶ 3, 196 P.3d 604 (internal quotation marks omitted).

¶ 10 Parents next argue that the juvenile court erred by communicating with the Tennessee court to determine if the case should be transferred and also erred by denying Parents the right to participate in the conversation between the courts. These arguments hinge on Parents' interpretation of the relevant statutory provisions. When interpreting a statute, "we first examine the statute's plain language and resort to other methods of statutory interpretation only if the language is ambiguous." *State v. Masciantonio,* 850 P.2d 492, 493 (Utah Ct.App. 1993). Parents also contend that their due process rights were violated when the Utah court gave the Tennessee court the option to decline jurisdiction after the Utah court declared itself an inconvenient forum. "Due process challenges are questions of law that we review applying a correction of error standard." *West Valley City v. Roberts,* 1999 UT App 358, ¶ 6, 993 P.2d 252.

¶ 11 Finally, Parents assert that the "wide latitude of discretion" generally employed on appeals from the juvenile court deprives them of a meaningful right of appeal and amounts to a violation of their due process rights under the Utah Constitution. In turn, Parents urge this court to adopt a de novo standard of review for "child welfare termination cases." Regardless of whether we adopt such a standard, Parents contend that the Termination Order was not supported by sufficient evidence. The juvenile

court's factual findings in a termination proceeding are reviewed under a clearly erroneous standard. *See In re J.N.*, 960 P.2d 403, 407 (Utah Ct.App.1998).

## ANALYSIS

### I. Subject Matter Jurisdiction

■ ¶ 12 Parents present several arguments challenging the juvenile court's exercise of jurisdiction.[5] First, Parents argue that the juvenile court erred when it determined that Utah was Child's home state in light of Sister's "wrongful actions" and Parents' June 1, 2007 revocation of Sister's guardianship filed in Tennessee and faxed to the Utah Fifth District Court and to the St. George Police Department. Second, Parents argue that the juvenile court's determination that Utah was an inconvenient forum necessitated a dismissal rather than a stay of the proceedings. We address each argument in turn.

### A. Child's Home State Status

¶ 13 First, Parents argue that "Child's 'home state' could not be established as Utah without authorizing the wrongful actions by [Sister] to hide ... Child from her parents to establish such." Parents contend this conduct is "unjustifiable" under the UUCCJEA, thereby preventing the juvenile court from properly exercising jurisdiction over the termination petition.

¶ 14 The UUCCJEA provides a Utah court with

> jurisdiction to make an initial child custody determination ... if: (a) this state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.

Utah Code Ann. § 78B–13–201(1)(a) (2008). "Home state" is defined as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." *Id.* § 78B–13–102(7). The UUCCJEA defines a "person acting as a parent" as "a person, other than a parent, who: (a) has physical custody[6] of the child or has had physical custody for a period of six consecutive months ... within one year immediately before the commencement of a child custody proceeding." *Id.* § 78B–13–102(13). Howev-

---

**5.** Parents devote a significant amount of their brief to challenging the juvenile court's exercise of emergency jurisdiction in the two protective order hearings. Specifically, Parents argue that because Child was in Tennessee when the juvenile court granted Sister's second protective order petition, the juvenile court's exercise of emergency jurisdiction to rule on that petition was clear error. Parents also challenge the juvenile court's "finding of 'emergency' circumstances" justifying its grant of the second protective order petition in light of the juvenile court's denial a week earlier of the first protective order petition based "on the same evidence." Parents contend that reversal on these grounds "is necessary ... to promote the[ ] general purposes of the UUCCJEA." Although challenges to subject matter jurisdiction can be raised at any time, *see Johnson v. Johnson*, 2010 UT 28, ¶ 10, 234 P.3d 1100, *cert. denied*, —— U.S. ——, 131 S.Ct. 656, 178 L.Ed.2d 482 (2010), Parents' argument is essentially moot because the requested relief—reversal of the second protective order petition—cannot affect the rights of the litigants in light of the subsequent Termination Petition proceedings. *See generally H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 21, 203 P.3d 943 ("An argument is moot [i]f the requested judicial relief cannot affect the

rights of the litigants." (alteration in original) (internal quotation marks omitted)). Our opinion on·the matter would be merely advisory, and Parents do not argue that an exception to mootness should apply beyond stating that reversal is necessary to promote the spirit of the UUCCJEA. *See generally In re C.D.*, 2010 UT 66, ¶ 13, 245 P.3d 724 (explaining the public interest exception to the mootness doctrine). We therefore decline to address the issue further. *See generally Angilau v. Winder*, 2011 UT 13, ¶ 14, 248 P.3d 975 ("The determination of whether we will reach the merits of a mooted issue in any particular case rests within the discretion of this court."); *Richards v. Baum*, 914 P.2d 719, 720 (Utah 1996) ("The strong judicial policy against giving advisory opinions dictates that courts refrain from adjudicating moot questions."). Interestingly, we previously denied a similar request for an advisory opinion made by Sister in her appeal from the denial of the first protective order. *See Mortenson v. Turley*, 2009 UT App 67U, para. 5 n. 3, 2009 WL 638262 (mem.).

**6.** Physical custody is defined as "the physical care and supervision of a child." Utah Code Ann. § 78B–13–102(14) (2008).

er, "if a court of this state has jurisdiction under [the UUCCJEA] because a person invoking the jurisdiction has engaged in unjustifiable conduct, the court shall[, with limited exceptions,] decline to exercise its jurisdiction." *Id.* § 78B–13–208(1).

¶ 15 Sister was appointed as Child's custodial guardian on May 3, 2007, and Child moved in with Sister in April 2007, placing Child in Utah under Sister's care for at least six full months before Sister's guardianship was revoked on November 8, 2007. Though the guardianship was revoked, Child was not returned to Parents until January 2008. Sister therefore remained in "physical custody of the child [and] ... ha[d] physical custody for a period of six consecutive months ... immediately before the commencement of [the Termination Petition] proceeding," *see id.* § 78B–13–102(13). Consequently, Sister was still a "person acting as a parent" when she filed her Termination Petition on December 31, 2007.[7] The juvenile court heard evidence supporting Parents' allegations of Sister's unjustifiable conduct but ultimately determined that Utah was Child's home state and that Sister "did not unlawfully detain[ ] the child in Utah to earn home state status." We agree.

¶ 16 First, Parents' assertion that they could not reach Sister or Child with the contact information provided and their claim that they could not find Sister or Child when they drove to Utah affirmatively demonstrate only one fact—that Parents could not get in touch with or find Sister or Child in May or June 2007. These allegations do not automatically support a conclusion that Sister acted in an unjustifiable manner and absconded with Child. Second, the only evidence supporting Parents' allegations that Sister intentionally hid Child from them is contained in Parents' own affidavits. This evidence alone is hardly sufficient to conclude

that Sister hid Child from them. Accordingly, we believe the juvenile court's finding that Sister "did not unlawfully detain[ ] the child in Utah to earn home state status" was not clearly erroneous.

¶ 17 Parents also argue that their request to rescind Sister's guardianship, filed on June 1, 2007, necessarily rendered Sister's continued custody of Child in Utah after that date "unjustifiable," *see id.* § 78B–13–208(1), and also revoked Sister's authority as "a person acting as a parent," *see id.* § 78B–13–201. Parents contend both grounds were sufficient to prevent the juvenile court from exercising jurisdiction.

¶ 18 Parents allege that they filed a request to rescind Sister's guardianship in a Tennessee court on June 1, 2007, and on the same day also faxed their rescission request to the Utah Fifth District Court and the St. George Police Department. In Parents' Motion to Dismiss the Termination Petition, they admit that faxing their rescission of guardianship was an "imperfect" action by "unsophisticates d[oing] the best they knew how" but claimed that the faxed documents equated to "petitioning the Court to terminate [Sister's] guardianship." (Internal quotation marks omitted.) The juvenile court disagreed with Parents and determined that "there [wa]s insufficient evidence that [Parents] properly rescinded the guardianship until after the requisite six month time period had run." The juvenile court also concluded that Parents' "unsuccessful efforts to terminate the guardianship d[id] not ... compromise ... [C]hild's home state status." We agree with the juvenile court.

¶ 19 Letters of guardianship can be unilaterally revoked in limited situations. *See, e.g., In re V.K.S.,* 2003 UT App 13, ¶ 23, 63 P.3d 1284 ("[W]hen a parent merely consents to the appointment of a guardian for

---

7. Sister suggests that her first protective order petition, filed November 20, 2007, constituted the initial custody proceeding under which Child's home state status was solidified. The GAL contends that the guardianship petition was the initial child custody proceeding and that as a result, Utah has had exclusive, continuing jurisdiction over this case since the May 3, 2007 approval of guardianship. At oral argument, Parents' counsel agreed that if it was not established that Sister improperly retained Child in Utah, then the juvenile court would be able to properly exercise home state jurisdiction. Because resolution of which petition should be deemed the initial custody proceeding is not necessary to reach our ultimate conclusion, we simply assume, without deciding, that Sister's December 31, 2007 Termination Petition constituted the "initial child custody proceeding" under the UUCCJEA.

that parent's minor child, there is only a suspension by circumstances of the parent's custody. If the parent thereafter petitions for termination of the guardianship and custody of the child, the ... court must grant the petition unless there has been a final factual determination depriving the parent of custody or terminating the parent's parental rights, by a court with proper jurisdiction.").[8] However, for a parent to unilaterally revoke an appointment of guardianship, the request for revocation must first be made in a meaningful manner. The record contains no evidence to confirm whether Parents' faxes were actually sent or successfully transmitted, and the one-page document filed in Tennessee is relatively vague—it does not actually refer to the May 3, 2007 guardianship approved in Utah. In its entirety, the filing reads, "We, [Parents], hereby rescind and revoke any and all Powers of Attorney previously granted to [Sister] on or about the 19th of March, 2007. The revocation is for all purposes including but not limited to any rights or authority previously given to [Sister] regarding our daughter, [Child]." The document was signed by Parents, notarized, and filed, although the record is unclear if it was actually filed with a court, or merely filed in a recorder's office in Tennessee. Based on this evidence, we do not believe the juvenile court's findings supporting rejection of Parents' home state arguments were clearly erroneous. Accordingly, we affirm the juvenile court's determination that Utah was Child's home state and that Utah could exercise exclusive jurisdiction over the case.

B. Inconvenient Forum

¶ 20 Parents next argue that the juvenile court's determination that Utah was an inconvenient forum necessitated a dismissal rather than a stay of the proceedings.

Additionally, Parents contend that the juvenile court "erroneously retained the ability to retake jurisdiction after declination by Tennessee even though such process was not authorized by the UUCCJEA." We affirm the juvenile court's retention of jurisdiction.

¶ 21 As previously discussed, the juvenile court had home state jurisdiction under the UUCCJEA to hear the termination petition. *See generally* Utah Code Ann. § 78B–13–201 (2008). However, "[a] court of this state that has jurisdiction under [the UUCCJEA] to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum." *Id.* § 78B–13–207(1). In that event, the Utah court "shall stay the proceedings upon condition that a child custody proceeding be promptly commenced in another designated state and may impose any other condition the court considers just and proper." *Id.* § 78B–13–207(3).

¶ 22 Here, the juvenile court determined that Utah was an inconvenient forum after weighing the statutory factors outlined in the UUCCJEA, *see id.* § 78B–13–207(2). The juvenile court ordered Sister to file her termination petition in Tennessee within ninety days and explained that Utah could exercise "original, exclusive jurisdiction" but "ha[d] declined," and as a result, the court's Inconvenient Forum Order amounted to an action under the UUCCJEA's provisions for "emergency jurisdiction."[9]

¶ 23 Because the juvenile court had exclusive jurisdiction under section 78B–13–201 to hear the termination petition, it did not need to justify its actions under emergency jurisdiction. *Cf. Hatch v. Hatch (In re Custody*

---

8. Parents also argue that "the unequivocal language of" *In re V.K.S,* 2003 UT App 13, 63 P.3d 1284, required the Utah district court to grant their guardianship revocation petition. Because of the manner in which we resolve this issue, we do not need to address the import of *In re V.K.S.* and accordingly decline to do so. *See Goebel v. Salt Lake City S. R.R.,* 2004 UT 80, ¶ 33, 104 P.3d 1185 ("We generally do not decide issues unnecessary to the outcome of the case. . . ." (internal quotation marks omitted)).

9. The juvenile court acknowledged that "[l]ogistically, the UUCCJEA is not real clear on how this all fits together, mostly because there is no action pending in Tennessee [yet]." Its solution then, was to decline home state jurisdiction and retain emergency jurisdiction to "protect the child" until a proceeding was commenced in Tennessee. Regardless of whether that was procedurally correct under the UUCCJEA, the effect was equivalent to a stay under the facts and circumstances of this case.

of Kalbes), 2007 WI App 136, ¶ 12, 302 Wis.2d 215, 733 N.W.2d 648 ("Under the Uniform Act, home state jurisdiction always receives priority, and other jurisdictional bases are available only when there is no home state, or where the home state declines jurisdiction."). Despite this unnecessary diversion into emergency jurisdiction, we believe the Inconvenient Forum Order is consistent with Utah Code section 78B–13–207(3)'s requirement that the Utah court "stay the proceedings upon condition that a child custody proceeding be promptly commenced in another designated state." *Id.* In general, a "stay" entails a suspension, "postponement or halting of a proceeding, judgment, or the like." *Black's Law Dictionary* 1548 (9th ed. 2009). Albeit imperfect in form, that is precisely what the juvenile court's simultaneous retention and declination of jurisdiction accomplished. The UUCCJEA's requirement that the juvenile court stay the proceedings in Utah until proceedings are commenced in Tennessee does not equate to Utah's surrender of jurisdiction.

¶ 24 The UUCCJEA unequivocally requires the Utah court to "stay the proceedings upon condition that a child custody proceeding be promptly commenced in another designated state," Utah Code Ann. § 78B–13–207(3), but Parents contend that the UUCCJEA also requires the court to dismiss the proceedings in Utah after determining that Utah is an inconvenient forum. We cannot find such a requirement in the UUCCJEA, and we will not read one into the statute. *See generally State v. Masciantonio*, 850 P.2d 492, 493 (Utah Ct.App.1993) (explaining that we defer first to the plain language of a statute to discern its meaning).

¶ 25 Additionally, the juvenile court determined that the Utah and Tennessee courts would communicate if Tennessee declined jurisdiction.[10] This determination was authorized by Utah Code section 78B–13–207(3)'s language permitting the juvenile court to "impose any other condition [it] considers just and proper." *See* Utah Code § 78B–13–207(3). It is hard to fathom how this com-

munication could not be "just and proper" in light of a separate provision in the UUCCJEA that expressly authorizes Utah courts to "communicate with a court in another state concerning a proceeding arising under this chapter," *id.* § 78B–13–110(1); *see also id.* § 78B–13–204(4) (requiring a Utah court exercising emergency jurisdiction to communicate with the court of another state that is exercising jurisdiction under sections 78B–13–201, 202, and 203 of the UUCCJEA); *id.* § 78B–13–206(2) ("If the court determines that a child custody proceeding was previously commenced in a court in another state having jurisdiction substantially in accordance with this chapter, the court of this state shall stay its proceedings and communicate with the court of the other state."). Accordingly, the juvenile court proceeded correctly in its Inconvenient Forum Order.

## II.  Court–to–Court Communication

¶ 26 Parents argue that they were impermissibly excluded from participating in the telephone call between the Utah juvenile court and the Tennessee juvenile court and that this exclusion amounted to a "violation of [Parents'] Due Process rights to be heard under the State and Federal Constitutions as well as the UUCCJEA." Parents also argue that the communication was improper in that the purpose of the telephone call should not have been to determine jurisdiction but to facilitate the transfer of the case between jurisdictions.

### A.  Parents' Exclusion from the Communication

¶ 27 Parents argue that section 78B–13–110(2) of the UUCCJEA *requires* the court to include the parties in a communication between courts when that communication concerns jurisdiction. We disagree with Parents' interpretation of the statute.

¶ 28 The UUCCJEA provides that "[a] court of this state may communicate with a court in another state concerning a proceeding arising under this chapter" and that "[t]he court *may* allow the parties to partici-

---

10. We note, however, that what actually occurred is that once Sister filed her termination petition in Tennessee and a judge was assigned to the case, the Utah juvenile court contacted the Tennessee court to discuss whether it planned to retain jurisdiction.

pate in the communication." Utah Code Ann. § 78B–13–110(1)–(2) (2008) (emphasis added). Although Parents were not included in the communication, the statute provides that exclusion is permissible when the parties are given an "opportunity to present facts and legal arguments before a decision on jurisdiction is made," *see id.* § 78B–13–110(2), which is precisely what occurred here. Additionally, the record indicates that none of the parties requested that they be included in the court-to-court communication, which occurred on January 15, 2009, despite having been provided ample notice of the Utah court's intention to call the Tennessee court in the Inconvenient Forum Order, dated July 28, 2008, and during a hearing on August 26, 2008. Therefore, we find no merit to Parents' argument that they were impermissibly excluded from participating in the court-to-court communication.

■ ¶ 29 However, because the result of the court-to-court communication was essentially a reversal of the Utah court's inconvenient forum ruling, Parents may have been entitled to an additional opportunity to address jurisdiction as a matter of due process. Nonetheless, our review of this issue is barred because Parents did not preserve their due process claims by first presenting them to the juvenile court. *See generally Tschaggeny v. Milbank Ins. Co.,* 2007 UT 37, ¶¶ 20, 22, 163 P.3d 615 ("[B]y not allowing the trial judge an adequate opportunity to consider the issue, [the appellant] waived the right to raise the issue on appeal."). Parents did not request a hearing after the court-to-court communication occurred or after receiving copies of each court's record of the conversation. The minutes from the hearing held a few weeks after the communication took place do not contain any reference to the arguments Parents now present concerning the communication, and there is otherwise no information in the record indicating that Parents objected to the reversal of the Inconvenient Forum Order on any grounds before they filed this appeal. Ultimately, it is Parents' burden to provide "citation to the

record showing that the issue was preserved in the trial court," *see* Utah R.App. P. 24(a)(5)(A). Without proof that this argument was preserved, Parents are precluded from raising a due process claim regarding the court-to-court communication on appeal. *See Tschaggeny,* 2007 UT 37, ¶ 22, 163 P.3d 615.

**B. Subjects Discussed in the Telephone Conversation**

■ ¶ 30 Parents also contend that the communication that occurred between the Utah and Tennessee juvenile courts impermissibly focused on which court should take jurisdiction. Parents argue that the conversation should have been restricted to the facilitation of a smooth transfer of the case from Utah to Tennessee. We disagree. There is no express prohibition in the UUCCJEA that would ban the Utah and Tennessee courts from discussing which state should take jurisdiction.[11] Case law suggests that the question of which court ought to exercise jurisdiction is commonly discussed between courts communicating pursuant to the UUCCJEA. *See, e.g., In re D.S.K.,* 792 P.2d 118, 121, 125–26 (Utah Ct.App.1990) (reversing Utah's exercise of jurisdiction under the UUCCJEA's precursor statute, but remaining silent as to the propriety of the communication between the Utah and Florida courts regarding which state should exercise jurisdiction); *Rawlings v. Weiner,* 752 P.2d 1327, 1330 (Utah Ct.App.1988) (upholding the jurisdiction determination reached in a conversation between a Utah court and a Washington court). Accordingly, we will not impose a limitation as to what topics the courts can discuss when communicating pursuant to this section of the statute. *Cf. State v. Kenison,* 2000 UT App 322, ¶ 10, 14 P.3d 129 (declining "to divine secret legislative intent" in order to read unwritten conditions into a statute when the plain language of the statute is clear).

---

11. The only provision of the UUCCJEA that addresses the topic of court-to-court communications provides that conversations involving "schedules, calendars, court records, and similar matters may occur without informing the parties." *See* Utah Code Ann. § 78B–13–110(3) (2008).

### III. "Wide Latitude of Discretion"

¶ 31 Parents contend that because the "wide latitude of discretion" that the juvenile court is regularly afforded on appeal from termination proceedings originated in a case from 1954, *Deveraux v. Brown,* 2 Utah 2d 334, 273 P.2d 185 (1954), which pre-dates Utah's current Juvenile Court Act of 1996(JCA), reliance on the "wide latitude of discretion" standard has been improper since at least the 1996 implementation of the JCA. Parents request that we abandon this precedent in favor of a de novo standard of review for termination proceedings.

¶ 32 In *In re Z.D.* (*In re Z.D. II* ), 2006 UT 54, 147 P.3d 401, the Utah Supreme Court addressed the scope of this court's review on an appeal from the juvenile court. In *In re Z.D.* (*In re Z.D. I* ), 2004 UT App 261, 98 P.3d 40, *remanded by In re Z.D. II,* 2006 UT 54, 147 P.3d 401, this court reversed the juvenile court, explaining that "[w]hile it rests primarily with the trial court to determine whether the evidence is clear and convincing, its finding is not necessarily conclusive." *Id.* ¶ 19 (internal quotation marks omitted). Additionally, in *In re Z.D. I,* this court explained, "An appellate court does not give factual determinations made by a trial judge the same amount of deference given to factual determinations made by a jury—that is, an appellate court does not, as a matter of course, resolve all conflicts in the evidence in favor of the appellee." *Id.* (internal quotation marks omitted). On certiorari, the State argued that this court's review amounted to an "appellate trial de novo, affording no deference to the juvenile court's factual findings or to its advantaged position with regard to determining credibility of expert and fact witnesses." *In re Z.D. II,* 2006 UT 54, ¶ 30, 147 P.3d 401. The supreme court agreed, to an extent, with the State and remanded, explaining, "An appellate court must launch any review of factual findings from rule 52(a) of the Utah Rules of Civil Procedure and its 'clearly erroneous' test." *Id.* ¶ 29.

¶ 33 We interpret the supreme court's ruling to determine that an "appellate trial de novo" on an appeal from the juvenile court is inappropriate under the current statutory framework. Accordingly, we deny Parents' request that we adopt a de novo standard of review for cases such as theirs. Indeed, their requested standard carries with it a potentially far-reaching ripple effect that would impact the general manner in which appeals are conducted in Utah. Parents have not persuaded us that such a far-reaching deviation from the course set by the supreme court is either wise or within our authority.

¶ 34 Parents next argue that the current standard of review affording the juvenile court a "wide latitude of discretion" violates their due process rights because such a standard eliminates any "purpose to appeal since there is no meaningful review of the challenge." They contend that "[a]ppealing any challenges to the sufficiency of the evidence or the conclusions drawn by the juvenile court is simply walking through the motions [ ]waiting [for] this erroneous standard to defeat a meaningful review of the merits." We disagree.

¶ 35 Due process provides that "[n]o person shall be deprived of life, liberty or property, without due process of law." Utah Const. art. I, § 7.

> However, due process is not a technical conception with a fixed content unrelated to time, place, and circumstances. Instead, due process is flexible and, being based on the concept of fairness, should afford the procedural protections that the given situation demands. The minimum requirements are adequate notice and an opportunity to be heard in a meaningful manner. To be considered a meaningful hearing, the concerns of the affected parties should be heard by an impartial decision maker.

*Dairy Prod. Servs., Inc. v. City of Wellsville,* 2000 UT 81, ¶ 49, 13 P.3d 581 (citation and internal quotation marks omitted).

¶ 36 The Utah Supreme Court explained in *In re Z.D. II,* that review on appeal begins with rule 52(a) of the Utah Rules of Civil Procedure. Rule 52(a) provides that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the

witnesses." Utah R. Civ. P. 52(a). The supreme court described this standard as involving a determination of whether "the findings ... are against the clear weight of the evidence." *In re Z.D. II*, 2006 UT 54, ¶ 32, 147 P.3d 401 (internal quotation marks omitted). It follows that "the scope of review contemplated by rule 52(a) encompasses the entire factual record." *Id.* ¶ 39. Inherent in rule 52(a) is also a consideration by the reviewing court of the standard of proof required in the proceedings below. *See id.* ¶ 40 ("It is ... appropriate when evaluating whether a result was 'clearly erroneous' for the reviewing court to consider the standard of proof the prevailing party below was required to meet."). Additionally, rule 52(a) contains a built-in level of deference to the factfinder. *See* Utah R. Civ. P. 52(a). However, that deference is not absolute: "[W]hether the findings were made by a judge or by a jury" is an important distinction because an appellate court *"must* indulge findings of fact made by a jury that support the verdict[, while n]o such indulgence is required of findings made by a judge." *See In re Z.D. II*, 2006 UT 54, ¶ 35, 147 P.3d 401 (emphasis added). Nevertheless, the appellate courts cannot completely disregard the findings made by a judge. Appellate courts "are removed temporally and geographically from trial courts," making the record on appeal cold. *See id.* ¶ 24. This gives the "appellate courts ... ample cause to defer to the judgment of trial judges on matters that cannot be reliably extracted and examined from such a two-dimensional record." *Id.* For instance, with respect to determinations that can be influenced greatly by factors incapable of reproduction in a paper record, like how the demeanor of witnesses affects their credibility, it is generally "not within the province of an appellate court to substitute its judgment for that of a front line fact-finder," *id.* In other words, rule 52(a) envisions a balancing act in which the appellate court weighs "the evidence with one eye on the scales and the other fixed firmly on its duty of deference to findings of fact. Thus, [the appellate court] may only disturb findings that offend the 'clear weight' of the evidence." *Id.* ¶¶ 33, 38.

¶ 37 Here, Sister had to prove her claim in the Termination Petition by clear and convincing evidence. *See* Utah R. Juv. P. 41(b) ("[N]eglect, abuse and dependency cases and cases involving the permanent deprivation of parental rights must be proved by clear and convincing evidence unless otherwise provided by law...."). We accord the juvenile court an appropriate level of deference in light of its witness credibility determinations, and we weigh the evidence in the record available on appeal to ascertain if the clear weight of that evidence is against the juvenile court's determination that Sister proved by clear and convincing evidence that Parents' parental rights should be terminated. Thus, the application of this standard of review is not a mere empty gesture or a prima facie deprivation of due process rights, as Parents argue.

## IV. The Juvenile Court's Termination Determination

¶ 38 Finally, Parents argue that the juvenile court applied the wrong standard of proof when rendering its decision to terminate their parental rights. "Whether the juvenile court applied the wrong standard of proof involves statutory interpretation and is thus a question of law reviewed for correctness." *In re S.H.*, 2005 UT App 324, ¶ 10, 119 P.3d 309. Parents also argue that the juvenile court's findings were contradictory. Parents' argument challenging the sufficiency of the juvenile court's findings is reviewed under a clearly erroneous standard. *See* Utah R. Civ. P. 52(a). We address each argument in turn.

## A. The Standard of Proof Applied in the Termination Petition Bench Trial

¶ 39 Parents argue that the juvenile court could not properly deny the first protective order petition, which involved a lower burden of proof, but then grant the Termination Petition, which involved a higher burden of proof, when each proceeding was based on the same allegations. As Parents state, "[n]o new allegations were raised in the termination trial that were not already in existence when the [juvenile] court entered its

[order denying the first protective order petition]."

¶ 40 The standard of proof applied by the juvenile court in the first protective order hearing was whether Sister's petition demonstrated by a preponderance of the evidence that Child was in imminent danger of sexual abuse. *See* Utah Code Ann. § 78A–6–302 (2008) (listing circumstances under the JCA by which a protective order will be granted if proved by a preponderance of the evidence); Utah Code Ann. § 78B–7–203(5) (Supp.2011) (explaining that ex parte child protective orders brought under this chapter will be granted "[i]f the court determines, based on a preponderance of the evidence, that the minor is being abused or is in imminent danger of being abused"). The juvenile court's denial of the first protective order petition focused on Sister's inability to satisfy the imminence element. Parents' argument ignores the pivotal role the imminence element played in the juvenile court's decision. As a result, Parents' argument does little to demonstrate how Sister's failure to satisfy the protective order standard requires an automatic denial of her Termination Petition when the "imminence" element is not a central consideration in a termination petition, *see* Utah Code Ann. § 78A–6–507 (2008). Additionally, the juvenile court clearly stated that it was applying a "clear and convincing" standard in the Termination Petition trial, and its indication of such was not mere lip service, as we discuss *infra* ¶¶ 46–51. Consequently, we find no merit to Parents' argument that the juvenile court applied the wrong standard of proof in the Termination Petition bench trial.

### B. Sufficiency of the Juvenile Court's Findings

¶ 41 Lastly, Parents contend that the juvenile court's findings were contradictory and, therefore, insufficient to meet the clear and convincing standard necessary to terminate Parents' parental rights. To illustrate this argument, Parents focus on the court's determinations that all of the witnesses were credible, that Parents "loved and cared for [Child] within their abilities" and sincerely denied the sexual abuse allegations, and that Child did not demonstrate any indications of sexual abuse during an interview with the Children's Justice Center. Parents compare those determinations with the juvenile court's ultimate decision to put greater weight on Sister's, Stepdaughter's, and Son's testimonies, which Parents describe as "unsubstantiated allegations from another state [that are without] any tangible proof."

¶ 42 As previously stated, Sister's Termination Petition needed to be proved by clear and convincing evidence. *See* Utah R. Juv. P. 41(b); Utah Code Ann. § 78A–6–506(3). "[F]or a matter to be clear and convincing to a particular mind it must at least have reached the point where there remains no serious or substantial doubt as to the correctness of the conclusion." *Greener v. Greener*, 116 Utah 571, 212 P.2d 194, 205 (1949). But "[n]ot every fact in the pyramid of reasoning need itself be clear and convincing." *Id.* at 204. In comparison, the less onerous preponderance of the evidence standard "means the greater weight of the evidence, or as sometimes stated, such degree of proof that the greater probability of truth lies therein." *Handy v. United States Bank, Nat'l Ass'n,* 2008 UT App 9, ¶ 25, 177 P.3d 80 (internal quotation marks omitted).

¶ 43 Additionally, a termination petition involves a two-part analysis. First "the juvenile court must find by clear and convincing evidence that ... the particular parent is unfit based on one of the grounds enumerated in Utah Code section 78A–6–507," and second, it must find "that it is in the best interest of the child that the parent's rights be terminated." *In re J.D.,* 2011 UT App 184, ¶ 11, 257 P.3d 1062, *cert. denied* 263 P.3d 390 (Utah Sept. 28, 2011) (No. 20110581).

¶ 44 The juvenile court granted Sister's Termination Petition based on its findings that Parents sexually abused Sister and Stepdaughter. This factual determination led to the juvenile court's conclusion that Child was "an abused and neglected child within the definition of the Juvenile Court Act because of the risk of harm to her" as a result of Father's abuse of her siblings. *See generally* Utah Code Ann. § 78A–6–105(25)(a)(iv) (Supp.2011) (defining neglect to

include "a child at risk of being neglected or abused because another child in the same home is neglected or abused"). The juvenile court concluded that its findings of abuse and neglect provided grounds for termination. *See generally id.* § 78A–6–507(1)(b) (2008) ("The court may terminate all parental rights with respect to a parent if the court finds . . . that the parent has neglected or abused the child. . . ."). Additionally, the juvenile court found that Parents' abuse and neglect rendered them unfit parents—also a ground for termination, *see id.* § 78A–6–507(1)(c) ("The court may terminate all parental rights with respect to a parent if the court finds . . . that the parent is unfit. . . ."). *See generally id.* § 78A–6–508(6)(a) (Supp. 2011) (explaining that sexual abuse of a sibling is considered prima facie evidence of unfitness); *In re J.S.P.*, 2010 UT App 10U, para. 5, 2010 WL 227550 (mem.) (per curiam) (same).

¶ 45 The evidence submitted over the course of the three-day bench trial consisted of testimony from Sister, Stepdaughter, Son, Sister's husband, Sister's father-in-law (who supervised several visits between Parents and Child while Child was living in Utah), Parents, a clinical psychologist, and a neighbor of Sister (who also supervised several visits between Parents and Child while Child was living in Utah). Depositions were admitted into evidence from Father's sister, Parents' landlord, a childhood friend of Mother, Child's first grade teacher, and Child's kindergarten teacher. Also in the record is a psychosexual evaluation performed on Father by the clinical psychologist. Besides Sister's, Stepdaughter's, Son's, and Parents' testimonies, the other evidence focused primarily on observations of Parents' parenting skills, Parents' relationship with Child, and Child's behavior and appearance. The juvenile court focused its analysis on the sexual abuse evidence, explaining that "[s]exual abuse is usually secretive, . . . and thus [Parents'] apparently adequate parental relationship is only marginally helpful in determining if abuse occurred."

¶ 46 Evidence supporting a finding of sexual abuse included the testimonies of Stepdaughter, Sister, and Son. Stepdaughter testified that Father had sexually abused her "pretty much any chance he had . . . on a fairly regular basis" for four years starting when Stepdaughter was thirteen and ending when she was seventeen, when she finally reported the abuse to her mother (not the same person as Child's mother) and her church bishop. Stepdaughter testified that after she disclosed the abuse to her mother, they confronted Father, who then "pulled out a gun and held it up to [her] and told [her] to shoot him with it." Son testified that he walked in on Stepdaughter and Father once while Father was sexually abusing her and that Father approached Son later that day to explain that "he wouldn't do it again." Sister testified that Father began abusing her the summer she was thirteen and abused her regularly throughout that summer. She explained that she did not report the incidents until she was sixteen, when she decided she "didn't want to be around [Father], and . . . stopped going [to visit him]."

¶ 47 Evidence weighing against a finding of abuse consisted of the psychosexual evaluation and testimonies from Father, Mother, and the psychologist who prepared the psychosexual evaluation. Father testified that he did not sexually abuse Sister or Stepdaughter. He further testified that after Sister first came forward with her sexual abuse allegations, Father was contacted by the Department of Children's Services (DCS) in Tennessee to take a lie detector test regarding whether he had ever "had intercourse with [Sister]." He assumed he passed the lie detector test because "nothing [was] ever said afterwards" and there were "no police charges." He testified that DCS also sent a caseworker to his house "once a week [for a year] for four hours a day to check on [Child], see if she was being abused or sexually abused or not being fed or anything." Father assumed the case was closed because he never heard anything more after the year of monitoring ended. Father suggested that Sister was really trying to get custody of Child for the Social Security payment of $515 that is paid on Child's behalf. Mother testified that the DCS visits were even more frequent than Father described and similarly denied participating in any sexual abuse of Sister.

¶ 48 An entire day's worth of testimony was spent on the psychosexual evaluation, which contains Father's biographical history and results on various psychological tests. The psychologist who conducted the tests testified that Father's results on some of the tests were not very reliable because she lacked specific information regarding the abuse allegations when she conducted the tests and because some of Father's results indicated that he was "try[ing to] present [himself] in a favorable light," which has the effect of artificially lowering the scores. The psychologist testified that despite those factors, she interpreted Father's results as indicating "that he did not fit the profile of a child molester." The psychologist also pointed out "that [her] evaluation was not ... definitive of his actual conduct."

¶ 49 The juvenile court ultimately put more weight on Sister's, Stepdaughter's, and Son's testimonies, finding that only Sister among them had a stake in the outcome of the case. The court rejected Father's suggestion that Sister instituted these proceedings to ultimately get the Social Security payments paid on behalf of Child, explaining that "there is no evidence supporting that speculation and the amount ($515) certainly would not be sufficient to raise the child." The juvenile court acknowledged the weaknesses in Sister's credibility, namely that she returned Child to Parents after Child's first summer in Utah "without taking action to protect her." However, the juvenile court also acknowledged that when Sister "initially took [Child] into her care she had to delay her education, change residences and make other adjustments to her daily life." In regard to Stepdaughter's credibility, the juvenile court found that "in theory [Stepdaughter] may have some desire to help ... [S]ister," but that "there was no evidence of that and to put herself through the difficulty of testifying about this abuse only to please ... [S]ister seems unlikely." Likewise, the juvenile court found that Son had "gone to considerable trouble to testify about these things and would have no reason to put himself to this difficulty other than to be sure the facts came out. The fact that giving this testimony will certainly end any meaningful relationship with his Father adds to his credibility."

The juvenile court also recognized that Mother's and Father's "denial[s] unavoidably seem[ed] less dramatic than the statements of abuse" and "consider[ed] this reality along with all other factors," such as its determination that Mother's and Father's "testimon[ies] seemed credible," that their "demeanor[s were] appropriate," and that they "seemed sincere in [their] denial[s]."

¶ 50 Although the evidence presented as to Child's best interest "was very thin," the juvenile court was persuaded that this was a case in which there was a "presumption that termination [wa]s in ... [C]hild's best interest" because "the abuse [faced by Sister and Stepdaughter] was invasive enough and the risk [to Child] great enough that the parental rights should be terminated." The juvenile court was also persuaded that termination of Parents' parental rights was in Child's best interest because Sister and her husband were ready and willing adoptive parents who could provide a good home for Child that Child was already comfortable in, and because Sister and Child were related. Parents offer no argument challenging these specific findings; they simply quote the juvenile court's comment that the best interest evidence was "thin." Accordingly, we will not disturb the juvenile court's best interest determination without any argument by Parents specifically challenging that determination as clearly erroneous. *See generally* Utah R. Civ. P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous...."); Utah R.App. P. 24(a)(9) (requiring the appellant's brief to "contain the contentions and reasons of the appellant with respect to the issues presented"); *Burns v. Summerhays*, 927 P.2d 197, 199 (Utah Ct.App.1996) ("[T]o permit meaningful appellate review, briefs must comply with the briefing requirements sufficiently to enable us to understand ... what particular errors were allegedly made ... and why, under applicable authorities, those errors are material ones necessitating reversal or other relief." (first omission in original) (internal quotation marks omitted)).

¶ 51 Because the juvenile court is in an "advantaged position with respect to the par-

ties and the witnesses," *see In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 (internal quotation marks omitted), we do not disturb its determinations of the witnesses' credibility. We defer to the juvenile court's decision to focus its analysis on the sexual abuse evidence and to put less weight on the other evidence regarding Parents' parenting skills, their relationship with Child, and Child's behavior. Sister's Termination Petition was filed because she feared Child was either already being sexually abused or at risk of being abused very soon as she approaches the age at which both Sister and Stepdaughter were first abused. Father's testimony that DCS did not pursue Sister's abuse allegations after a year of monitoring Parents does not disprove Stepdaughter's, Son's, and Sister's allegations of past sexual abuse by Father or undermine Sister's concern that Child was at risk of abuse in light of Father's alleged history of sexual abuse. The juvenile court also acknowledged the difficulty for Parents to prove a negative—that no abuse occurred—especially with only testimonial evidence. The juvenile court carefully weighed this consideration in light of the other evidence before determining that Stepdaughter's, Sister's, and Son's testimonies "carrie[d] the day." We therefore determine that the juvenile court neither failed to consider all of the evidence nor rendered a decision against the clear weight of that evidence. *See generally id.* ("[T]he juvenile court's decision [can] be overturned only if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence."). Accordingly, the juvenile court's order terminating Parents' parental rights is affirmed.

## CONCLUSION

¶ 52 The juvenile court correctly determined that Utah was Child's home state and that Utah courts could exercise exclusive jurisdiction. The juvenile court correctly stayed the proceedings in Utah while waiting for Tennessee to accept jurisdiction and properly exercised its discretion to exclude the parties in its communication with the Tennessee court. Parents did not preserve their due process challenge to the juvenile court's decision to exclude them from the court-to-court communication. Additionally, the UUCCJEA does not contain a restriction applicable under the facts of this case that would limit what the Utah and Tennessee courts could discuss during their telephone conversation. We reject Parents' request to institute a de novo standard of review for appeals from the juvenile court, and we reject Parents' argument that application of anything but a de novo standard of review amounts to a due process violation. The juvenile court applied the proper clear and convincing standard when it reviewed Sister's Termination Petition, and its ultimate decision was not clearly erroneous. Affirmed.

¶ 53 WE CONCUR: CAROLYN B. McHUGH, Associate Presiding Judge and STEPHEN L. ROTH, Judge.